Case 1:24-cr-00014-RLY-KMB Document 314-1 Filed 11/05/25 Page 1 of 15 PageID #: 2715

FILED
JAN 17 2024
U.S. CLERK'S OFFICE
INDIANAPOLIS, INDIANA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:24-cr-00014-RLY-KMB |
| | ) | |
| THOMAS "TOM" H. STOUGHTON, | ) | -01 |
| a/k/a "Senior," | ) | |
| a/k/a "Tom Sr.," | ) | |
| PHILLIP HOLDEN, and | ) | -02 |
| PERCY CLARK, | ) | -03 |
| | ) | |
| Defendants. | ) | |

**INDICTMENT**

The Grand Jury charges that:

**GENERAL ALLEGATIONS**

At times material to this Indictment:

**Introduction**

1. STOUGHTON, HOLDEN, CLARK, Individual 2, Christopher King, and others known to the Grand Jury, conspired to defraud the State of Indiana through their operation of two online charter schools, called Indiana Virtual School ("IVS") and Indiana Virtual Pathways Academy ("IVPA").[1] Like other public schools and charter schools, IVS and IVPA received funding from the State of Indiana based upon the number of students a school claimed to be

---

1 "Indiana Virtual School" and "Indiana Virtual Pathways Academy" were the assumed businesses names of registered Indiana not-for-profit entity Indiana Virtual Education Foundation, Inc.

enrolled and attending the school. In general, the more students enrolled, the more funding IVS and IVPA received from the State of Indiana.

2. The Indiana Department of Education ("IDOE") administers funding for public and charter schools in the State of Indiana. IDOE generally determines funding levels based on the number of students enrolled in a school, referred to as "average daily membership" or "ADM," on a specific date or dates during the school year, referred to as a "Count Day." Count Day was generally in September and was in December for special education students. Under state law, a student was "enrolled" on the Count Day if the student was both registered with the school and attending the school's educational programs or receiving its educational services.

3. In or about 2017, Indiana law required schools like IVS and IVPA to create a policy under which the schools would monitor student attendance and participation and withdraw students who were not attending and/or participating in the schools. In 2017, IVS and IVPA created an "Engagement Policy" that stated students with no logon activity for a period of time would be withdrawn from enrollment at the schools.

4. STOUGHTON, HOLDEN, CLARK, Individual 2, King, and others known to the Grand Jury conspired to falsely claim that thousands of students were "enrolled" in IVS and IVPA, when STOUGHTON, HOLDEN, CLARK, Individual 2, and King knew those students were not actually enrolled because the students were not attending or receiving educational services from IVS or IVPA. As a result of these fraudulently inflated enrollment numbers, the State of Indiana paid IVS and IVPA millions of dollars more than they would have received had they claimed their enrollment accurately.

5. IVS and IVPA, in turn, paid funds received from the State of Indiana to for-profit companies, many of which were controlled and/or operated by STOUGHTON, who was the

same person who controlled and operated IVS and IVPA. After the money was funneled through these for-profit companies, millions of dollars were paid out to STOUGHTON and members of his family, CLARK, King, and others.

**Defendants**

6. THOMAS H. STOUGHTON owned and/or controlled IVS, IVPA, and multiple related companies, including AlphaCom, Inc., Alpha Consolidated Services, LLC, A Simple Reminder, Inc., EightBit Designs d/b/a BitLoft, American Pathways Academy, LLC, Enhanced Cyber Learning, LLC, and Education Innovation Research, LLC.

7. PHILLIP HOLDEN was the Director of IVS and had various areas of responsibility at IVS and IVPA, including but not limited to student enrollment, tracking student attendance, and teacher compensation. HOLDEN ultimately reported to STOUGHTON.

8. PERCY CLARK was the Superintendent of IVS and IVPA and had various areas of responsibility, including but not limited to public relations and managing the relationship with Daleville Community Schools. CLARK reported to STOUGHTON.

9. Individual 2 was the manager of the student service representatives ("SSRs") and was responsible for implementing changes to the enrollment process and ensuring that the SSRs enrolled as many students as possible. Individual 2 reported to Christopher King, and at times also HOLDEN, who each in turn ultimately reported to STOUGHTON.

10. Christopher King was an officer of AlphaCom, LLC, and was the Manager of School Operations. He was responsible for, among other things, overseeing the enrollment process for IVS and IVPA. King reported to STOUGHTON.

## Charter Schools

11. Indiana law allows for the establishment of charter schools, which are alternatives to regular schools that are open to the public. Charter schools must be not-for-profit entities and have an "Authorizer." Charter schools may be in person, virtual, or both.

12. An Authorizer is an entity defined by state law that sponsors a charter school. The charter school reaches an agreement with the Authorizer that allows the charter school to exist and operate for a period of five years. The agreement is renewable. The Authorizer is tasked with oversight responsibilities on behalf of IDOE. Daleville Community Schools was the Authorizer for IVS and IVPA.

## COUNT 1
**Title 18, United States Code, Section 1349**
**(Conspiracy to Commit Wire Fraud)**

13. Paragraphs 1-12 are realleged and incorporated herein.

14. Beginning in or before June 2016 and continuing through June 14, 2019, within the Southern District of Indiana and elsewhere, the Defendants, STOUGHTON, HOLDEN, CLARK, Individual 2, and King did knowingly and willfully combine, conspire, confederate and agree with others known to the Grand Jury, to violate Title 18, United States Code, Section 1343 (Wire Fraud), that is, to knowingly and with intent to defraud, devise, and intend to devise, a scheme and artifice to defraud, and to obtain money and property by means of materially false or fraudulent pretenses, representations, and promises, knowing that they were false and fraudulent when made, and transmit and cause to be transmitted certain wire communications in interstate and foreign commerce, for the purpose of executing the scheme, and for attempting so to do.

## Overview and Purpose of the Conspiracy

15. Paragraphs 1-5 are realleged and incorporated herein.

## Manner and Means of the Conspiracy

16. STOUGHTON, HOLDEN, CLARK, Individual 2, King, and others known to the Grand Jury used the following manners and means, among others, to carry out the unlawful purpose of their conspiracy:

### *Inflating the Enrollment of Students in IVS and IVPA*

17. Beginning in or before 2016, STOUGHTON, HOLDEN, Individual 2, King, and others known to the Grand Jury, caused students to be enrolled, or remain enrolled in IVS/IVPA who should not have been enrolled or who should have been unenrolled.

18. For example, beginning in or about Summer 2016, employees noticed that hundreds of purported students of IVS/IVPA had not logged onto or participated in a class for months. When employees attempted to unenroll these students for inactivity, STOUGHTON, Individual 2, King, and others known to the Grand Jury directed that no students were allowed to be unenrolled.

19. Additionally, beginning in or about May 2017, STOUGHTON directed that HOLDEN, Individual 2, King, and others known to the Grand Jury change the enrollment process at IVS. STOUGHTON, HOLDEN, Individual 2, and King directed that employees stop obtaining verification that a student in fact wanted to attend IVS and/or IVPA before they were enrolled and/or reenrolled. This practice continued for the 2017 and September 2018 Count Days.

20. Also, beginning in or about Summer 2017, STOUGHTON, HOLDEN, Individual 2, and King directed Information Technology personnel to make incomplete student applications available to employees so that the student information could be used to enroll students in IVS

and/or IVPA for the 2017 and September 2018 Count Days. Most of these "students" never participated in any way.

21. Shortly before the September 2018 Count Day, STOUGHTON, Individual 2, and King directed their Information Technology contractor to compile a list of students who were not listed in the IDOE database as attending another school and who had previously been unenrolled from IVS and/or IVPA due to inactivity, in accordance with a state-mandated "Engagement Policy" that IVS and IVPA adopted. Upon receiving a list of approximately 600 students, STOUGHTON, Individual 2, and others known to the Grand Jury caused employees to reenroll without authorization many of these students in IVS/IVPA and be counted on the September 2018 Count Day.

***Creating IVPA and Enrolling Inactive IVS Students in IVPA***

22. Prior to the creation of IVPA, IVS received an "F" grade from IDOE. This potentially put IVS at risk of losing its charter, and thereby its funding. In or about 2017, STOUGHTON, CLARK, HOLDEN and King induced Daleville Community Schools to authorize the creation of IVPA.

23. After IVPA was created, STOUGHTON, CLARK, HOLDEN, Individual 2, King, and others transferred hundreds of students who had not been attending any classes from IVS to IVPA to continue to "count" and receive money for these students but also "protect" IVS from being held accountable for the students' non-performance.

24. Further, in or about January 2018, hundreds of students were found to be in violation of IVS's Engagement Policy due to their inactivity. Rather than withdraw them, however, STOUGHTON directed that hundreds of these students be transferred from IVS to

IVPA so that the defendants could continue to "count" the students and receive payment for their "enrollment."

***Submitting Inflated Enrollment Numbers to IDOE***

25. On various dates beginning in or before 2017, STOUGHTON, CLARK, HOLDEN, Individual 2, King, and others known to the Grand Jury, caused IVS and/or IVPA to falsely represent to IDOE the student enrollment at IVS and/or IVPA by claiming as enrolled numerous students that they knew were not attending IVS and/or IVPA because those students had not logged on or completed any coursework at IVS and/or IVPA for a significant period of time before the Count Day.

26. As a result of these false submissions, IDOE paid in excess of $44,000,000 to IVS/IVPA that IVS/IVPA was not entitled to receive.

***Tracking Actual Student Attendance to Calculate Teacher Pay***

27. To reduce costs of operating the schools, in or before May 2016, STOUGHTON directed that IVS teachers would be paid based upon the number of students that actually logged on and attended classes, as opposed to the number of students that STOUGHTON, CLARK, HOLDEN, Individual 2, and King claimed to IDOE were enrolled in the schools.

28. STOUGHTON directed that members of their Information Technology staff track the actual logons and participation by their students. To that end, STOUGHTON, HOLDEN, CLARK, King, and others known to the Grand Jury received student active/inactive reports on a reoccurring basis.

29. At multiple points from 2015 through and including 2018, employees questioned why students were still being counted when they were not participating or attending the schools. STOUGHTON, HOLDEN, Individual 2, and King directed that no student be unenrolled. In

some cases, employees went so far as to unenroll non-participating students. STOUGHTON, Individual 2, and King ordered that these students be reenrolled so that they would be counted on the Count Day.

***Transferring Money out of IVS and IVPA for Personal Use and Benefit***

30. Beginning in or about 2017, STOUGHTON paid DM, an audio/video technician, to sign documents on behalf of shell companies created in his name. STOUGHTON then caused the transfer of millions of dollars out of accounts for IVS and IVPA, which were not-for-profits, to companies controlled by STOUGHTON. From there, the money was transferred between multiple such companies until ultimately landing in bank accounts controlled by STOUGHTON, members of STOUGHTON's family, CLARK, and others.

**Overt Acts**

31. In furtherance of the conspiracy and to affect the objects of the conspiracy, the following overt acts, among others, were committed in the Southern District of Indiana and elsewhere:

32. On or about May 10, 2016, STOUGHTON directed the creation of a report that tracked the activity and non-activity of students.

33. On or about March 30, 2017, HOLDEN and CLARK fired an employee who sent an email to IDOE attempting to inform IDOE of the fraud that was occurring at IVS.

34. In or about April 2017, STOUGHTON, HOLDEN, CLARK and King discussed and drafted a letter that CLARK sent to Daleville Community Schools claiming that the concerns raised by the employee referenced in paragraph 33 were not true.

35. On or about May 11, 2017, STOUGHTON, HOLDEN, Individual 2 and King changed the enrollment procedures so that students were enrolled without verifying that the

student in fact wished to be enrolled. This was done so that the students could be submitted to IDOE for funding.

36. In or about 2017, STOUGHTON and King directed that students dropped by an employee for nonattendance be reenrolled so that they could be counted for funding.

37. On or about August 7, 2017, STOUGHTON, CLARK, HOLDEN and King caused Daleville Community Schools to authorize the creation of IVPA.

38. From May 2017 through and including September 15, 2017, STOUGHTON, Individual 2 and King directed the enrollment of hundreds of students that they never verified actually wished to enroll and attend.

39. On or about September 15, 2017, STOUGHTON, CLARK, HOLDEN, Individual 2, and King caused IVS and IVPA to submit materially false ADM counts to IDOE in that such counts claimed as enrolled or attending approximately 3,086 students that were not attending IVS and/or IVPA.

40. On or about October 13, 2017, CLARK falsely certified the September 2017 ADM count.

41. On or about December 1, 2017, STOUGHTON, CLARK, HOLDEN, Individual 2, King, and others known to the Grand Jury caused IVS and/or IVPA to submit a false special education count to IDOE.

42. On or about January 31, 2018, STOUGHTON, HOLDEN, and Individual 2 transferred hundreds of students from IVS to IVPA in violation of the engagement policy so that IVS/IVPA would continue to be paid for the students.

43. On or about February 1, 2018, STOUGHTON, CLARK, HOLDEN, Individual 2, King, and others known to the Grand Jury caused IVS and/or IVPA to submit a false ADM count to IDOE.

44. On or about February 28, 2018, STOUGHTON and King directed that IVS/IVPA send false records to IDOE to reduce the number of students IDOE would expect to complete standardized tests, thereby attempting to prevent IVS from receiving another "F" from IDOE.

45. In or about August 2018 through and including September 13, 2018, STOUGHTON, Individual 2 and King directed IT staff to search the IDOE database for students previously withdrawn from IVS/IVPA for non-attendance, and that were not enrolled with another school, so that IVS/IVPA could reenroll and claim those students on the September 14, 2018, Count Day.

46. On or about September 2018, STOUGHTON, Individual 2, and King identified students previously dropped from IVS/IVPA and directed their reenrollment without their permission.

47. On or about September 14, 2018, STOUGHTON, CLARK, HOLDEN, Individual 2, and King caused IVS and IVPA to submit materially false ADM counts to IDOE in that such counts claimed as enrolled or attending approximately 4,530 students that were not attending IVS and/or IVPA.

48. On or about October 11, 2018, CLARK falsely certified the September 2018 ADM count.

49. On or about December 1, 2018, STOUGHTON, CLARK, HOLDEN, Individual 2, King, and others known to the Grand Jury caused IVS and/or IVPA to submit a false special education count to IDOE.

50. On or about February 1, 2019, STOUGHTON, CLARK, HOLDEN, Individual 2, King, and others known to the Grand Jury caused IVS and/or IVPA to submit a false ADM count to IDOE.

**Use of Interstate Wire Communications**

51. In furtherance of the conspiracy and scheme, the defendants made and caused to be made the use of interstate wire communications, examples of which are listed in Counts 2–18 below.

All in violation of Title 18, United States Code, Section 1349.

**COUNTS 2–18**
**Title 18, United States Code, Sections 1343 and 2**
**Wire Fraud**

52. Paragraphs 6 through 12 are realleged and incorporated herein.

53. Beginning in or before June 2016 through and including June 14, 2019, STOUGHTON, CLARK, HOLDEN, Individual 2, and King devised and intended to devise a scheme, as set forth above, to defraud IDOE, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

**Purpose**

54. The Grand Jury realleges and incorporates by reference paragraphs 1 through 5 of this Indictment as a description of the purpose of the scheme and artifice.

**Manner and Means**

55. The Grand Jury realleges and incorporates by reference paragraphs 16 through 50 of this Indictment as a description of the manner and means of the scheme and artifice.

**Use of Interstate Wires**

56. On or about each of the dates specified below, in Indianapolis, Indiana, in the Southern District of Indiana, STOUGHTON, CLARK, HOLDEN, Individual 2, King and others known to the Grand Jury, for the purpose of executing the scheme described above, and attempting to do so, caused to be transmitted by means of wire communication in interstate commerce the signals and sounds described below for each count, each transmission constituting a separate count:

| Count | Date | Description |
|---|---|---|
| 2 | January 29, 2019 | Wire transfer in the amount of $55,938.38 from IDOE's bank account to IVS/IVPA's bank account, each wire transfer involving a signal which traveled from Virginia to Indiana. |
| 3 | February 6, 2019 | Wire transfer in the amount of $396,576.18 from IDOE's bank account to IVS/IVPA's bank account, each wire transfer involving a signal which traveled from Virginia to Indiana. |
| 4 | February 6, 2019 | Wire transfer in the amount of $59,371.03 from IDOE's bank account to IVS/IVPA's bank account, each wire transfer involving a signal which traveled from Virginia to Indiana. |
| 5 | February 15, 2019 | Wire transfer in the amount of $3,185,925.24 from IDOE's bank account to IVS/IVPA's bank account, each wire transfer involving a signal which traveled from Virginia to Indiana. |
| 6 | February 15, 2019 | Wire transfer in the amount of $410,625.76 from IDOE's bank account to IVS/IVPA's bank account, each wire transfer involving a signal which traveled from Virginia to Indiana. |
| 7 | February 15, 2019 | Wire transfer in the amount of $32,091.81 from IDOE's bank account to IVS/IVPA's bank account, each wire transfer involving a signal which traveled from Virginia to Indiana. |

| Count | Date | Description |
|---|---|---|
| 8 | February 27, 2019 | Wire transfer in the amount of $13,049.00 from IDOE's bank account to IVS/IVPA's bank account, each wire transfer involving a signal which traveled from Virginia to Indiana. |
| 9 | March 15, 2019 | Wire transfer in the amount of $2,982,250.93 from IDOE's bank account to IVS/IVPA's bank account, each wire transfer involving a signal which traveled from Virginia to Indiana. |
| 10 | March 15, 2019 | Wire transfer in the amount of $410,625.76 from IDOE's bank account to IVS/IVPA's bank account, each wire transfer involving a signal which traveled from Virginia to Indiana. |
| 11 | April 15, 2019 | Wire transfer in the amount of $2,982,250.91 from IDOE's bank account to IVS/IVPA's bank account, each wire transfer involving a signal which traveled from Virginia to Indiana. |
| 12 | April 15, 2019 | Wire transfer in the amount of $410,625.73 from IDOE's bank account to IVS/IVPA's bank account, each wire transfer involving a signal which traveled from Virginia to Indiana. |
| 13 | April 15, 2019 | Wire transfer in the amount of $45,140.81 from IDOE's bank account to IVS/IVPA's bank account, each wire transfer involving a signal which traveled from Virginia to Indiana. |
| 14 | May 15, 2019 | Wire transfer in the amount of $2,982,250.93 from IDOE's bank account to IVS/IVPA's bank account, each wire transfer involving a signal which traveled from Virginia to Indiana. |
| 15 | May 15, 2019 | Wire transfer in the amount of $410,625.76 from IDOE's bank account to IVS/IVPA's bank account, each wire transfer involving a signal which traveled from Virginia to Indiana. |
| 16 | May 15, 2019 | Wire transfer in the amount of $87,854.95 from IDOE's bank account to IVS/IVPA's bank account, each wire transfer involving a signal which traveled from Virginia to Indiana. |

| Count | Date | Description |
|---|---|---|
| 17 | June 14, 2019 | Wire transfer in the amount of $2,982,250.91 from IDOE's bank account to IVS/IVPA's bank account, each wire transfer involving a signal which traveled from Virginia to Indiana. |
| 18 | June 14, 2019 | Wire transfer in the amount of $496,227.57 from IDOE's bank account to IVS/IVPA's bank account, each wire transfer involving a signal which traveled from Virginia to Indiana. |

Each of Counts 2–18 is a separate violation of violation of Title 18, United States Code, Sections 1343 and 2.

[redacted]

Case 1:24-cr-00014-RLY-KMB Document 1 Filed 01/17/24 Page 15 of 15 PageID

[redacted]

A TRUE BILL:

[redacted]

FOREPERSON

ZACHARY A. MYERS
United States Attorney

By: Bradley P. Shepard
Samantha Spiro
Assistant United States Attorneys
*NJL*